## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JULIUS RECARDO YOUNG,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 00-CV-00310-JHP-PJC** |
| | ) | |
| **MARTY SIRMONS,[1] Warden** | ) | |
| **OKLAHOMA STATE PENITENTIARY** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

This matter comes before the Court on a 28 U.S.C. § 2254 amended petition for writ of habeas corpus (Dkt. # 22), filed by Oklahoma death row inmate Julius Recardo Young. Petitioner, who appears through counsel, challenges his conviction and sentence in Tulsa County District Court Case No. CF-94-937. Respondent filed a response to the amended petition denying its allegations. Dkt. # 30. Petitioner filed a reply (Dkt. # 33), and supplemental authority in support of his ineffective assistance of counsel claim. Dkt. ## 50, 54. Respondent also filed a notice of supplemental authority in support of his argument opposing the ineffective assistance of counsel claim. Dkt. # 57. The state court record has been supplied.[2] For the reasons discussed herein, the Court finds that Petitioner's request for habeas relief shall be denied.

---

[1]      The Court is aware that Marty Sirmons is the current warden of Oklahoma State Penitentiary. Pursuant to Rule 2(a), Rules Governing Section 2254 Cases and Rule 25(d)(1), Federal Rules of Civil Procedure, Warden Sirmons is hereby substituted as the respondent in this case. The Court Clerk shall be directed to note such substitution on the record.

[2]      The trial court record shall be cited as (O.R. Vol.__ at __. The transcripts shall be cited as (Tr. Trans. Vol. __ at __).

The Court has reviewed: (1) the amended petition for writ of habeas corpus, response, reply, and supplemental authorities provided by Petitioner and Respondent; (2) transcript of preliminary hearing held April 18 and April 25, 1994; (3) transcript of motion hearing held June 17, 1994; (4) transcript covering *voir dire* proceedings held September 5-8, 1995, labeled "Volume I (Pages 1-508)"; (5) transcript covering jury trial proceedings held September 11-13, 1995, labeled "Volume II" and containing pages numbered 510-990; (6) partial transcript of jury trial proceedings held September 14, 1995, containing pages numbered 3-85; (7) transcript of jury trial and sentencing proceedings held September 15-21, 28, and October 4, 1995, labeled "Volume III (Pages 513-960); (8) transcript of jury verdict in trial proceedings held September 21, 1995, containing pages 1-14; (9) copies of documents and exhibits admitted in jury trial proceedings; (10) original record in Tulsa County District Court Case No. CF-94-937, consisting of Volumes I, II, III, a volume (33 pages) covering documents filed from February 22, 1994, through December 13, 1996, and a volume (37 pages) also covering documents filed from February 22, 1994, through December 13, 1996; and (11) all other records[3] before the Oklahoma Court of Criminal Appeals ("OCCA") which were transmitted to this Court and verified by the parties as complete for purposes of this habeas corpus proceeding. Dkt. # 34.

## BACKGROUND

### I.    Factual Background

On October 1, 1993, the brutally beaten bodies of Joyland Morgan and her son, Kewan Morgan, were found in their Tulsa, Oklahoma, apartment. Petitioner was charged and convicted of

---

[3]    The records include documents from OCCA Case Nos. F-95-1142, PC-97-884, MA-1997-342 (also referenced as O-97-342), MA-1996-1401(also referenced as O-96-1401), and PE-1997-51 (also referenced as PR-1997-51 and P-97-51).

the murders. Pursuant to 28 U.S.C. § 2254(e)(1), the historical facts as found by the state court are presumed correct. Following review of the record, trial transcripts, and the admitted exhibits, this Court finds that the factual summary by the OCCA is adequate and accurate. The Court, therefore, adopts the following factual summary as its own:

Julius Recardo Young was convicted of murdering his girlfriend's daughter and six year old grandson. The murders occurred two days after his girlfriend, Joyslon Edwards, advised him she wanted to cool their relationship, and he would not get a key to her new apartment. She was not giving him a key, because she wanted her daughter and grandson to "feel safe" when they visited her. They did not like Young. Young had a key to the apartment Edwards had been sharing with her daughter, Joyland Morgan, and her grandson, Kewan Morgan. The day before the murders Edwards demanded the key from Young, but he did not return it.

Joyland and Kewan Morgan were beaten to death in their Tulsa apartment on October 1, 1993. Their wounds indicated the murder weapon was a blunt instrument similar to a baseball bat, but the murder weapon was never found. Ms. Morgan sustained defensive wounds to her hands and arms, and at least thirteen blows to her face and head. These blows broke her jaw, tore open her scalp, and fractured her skull. She was found slumped against a living room wall. Kewan Morgan died in his bed. He sustained massive head fractures caused by two separate blows.

Every night before she went to bed Joyland Morgan secured her front door with two locks and a security chain. The intruder opened both locks with a key and pushed through the security chain, breaking it. A piece of the broken chain was missing from the apartment.

No eye-witnesses were found. However, a downstairs neighbor was awakened at 3:40 a.m. by a single loud thump from Morgan's apartment. Joyslon Edwards testified she saw a baseball bat in Young's trunk the night before the murders, but the next day it was gone.

Young always drove Edwards to work and the day of the murders he arrived at 4:15 a.m., earlier than usual. Edwards asked him for change so she could use the vending machines at work. When Young pulled out the contents of his pocket, Edwards saw a piece of security chain similar to the one she had installed on her daughter's door. Later that day when Edwards learned of the murders, she reported this evidence to police.

Young lived with his mother at the time, and the police obtained a warrant to search the mother's home. Edwards told them what Young had worn the previous

evening. The police recovered the shoes described by Edwards and these bore a visible spot of blood. Young accompanied the police during the search. He volunteered the drop was fish blood. DNA testing revealed the drop was human blood consistent with that of Joyland and Kewan Morgan. The police also recovered a freshly laundered shirt which tested positive for blood when it was exposed to luminal.

Young v. Oklahoma, 992 P.2d 332, 336-37 (Okla. Crim. App. 1999). Any additional facts[4] necessary for a determination of Petitioner's claims will be set forth in detail throughout this opinion.

## II.    Procedural History

Petitioner was convicted by a jury in the District Court of Tulsa County, State of Oklahoma, Case No. CF-94-937, of two counts of First Degree Murder and one count of First Degree Burglary. He was represented at trial by attorneys Jim Fransein[5] and Stuart Southerland.  Jury selection and voir dire were conducted on September 5-8, 1995. The guilt phase of Petitioner's trial began on September 11, 1995, and concluded on September 20, 1995, with the announcement of the jury's verdict. The capital sentencing phase was conducted on September 21, 1995, resulting in the imposition of a sentence of death on each of the murder counts, and fifty (50) years imprisonment on the first degree burglary count. The jury found the existence of three (3) aggravating circumstances as to each murder conviction: (1) the defendant knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious or cruel; and (3) the

---

[4]     The Court also adopts other specific factual summaries of the OCCA recited throughout this opinion. 28 U.S.C. § 2254(e)(1).

[5]     Mr. Fransein was lead defense counsel at trial. Unless otherwise indicated, references in this opinion and order to the singular form of "trial counsel," or "trial attorney" shall refer to Mr. Fransein.

existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[6] Petitioner was formally sentenced on October 4, 1995.

Petitioner appealed his convictions and sentences to the OCCA in Case No. F-95-1142. He was represented by the Tulsa County Public Defender's Office in the direct appeal proceeding.[7] The OCCA affirmed Petitioner's first degree murder convictions and death sentences in a published decision dated November 6, 1998.  <u>Young</u>, 992 P.2d 332 (Okla. Crim. App. 1998). In its decision, the OCCA "invalidated the 'continuing threat' aggravating circumstance as to both Counts for insufficient evidence, and the 'especially heinous, atrocious or cruel' aggravating circumstance as to Count II, the murder of Kewan Morgan, because the State did not give the defendant notice it would seek to prove this aggravator for Count II." <u>Id.</u> at 348.   Petitioner was granted a rehearing from the OCCA pursuant to Rule 3.14(B), Rules of the Oklahoma Court of Criminal Appeals. Upon rehearing, the OCCA denied all requested relief in its Order filed February 19, 1999.

The Petitioner then sought certiorari review from the United States Supreme Court. This request was denied on October 4, 1999. <u>Young v. Oklahoma</u>, 528 U.S. 837 (1999).

---

[6]      The prosecution alleged a fourth aggravating circumstance, but the jury did not find that Petitioner committed the murders for the purpose of avoiding or preventing a lawful arrest or prosecution. O.R. Vol. III at 437.

[7]      The Tulsa County Public Defender's Office also represented Petitioner in Case Nos. MA-1997-342 (Ex Parte Petition for Writ of Mandamus), MA-1996-1401(Ex Parte Petition for Writ of Mandamus or Alternatively Request for Evidentiary Hearing under Rule 3.11), and PE-1997-51 (Application to Assume Original Jurisdiction and Petition for Writ of Prohibition). These matters related to funding for experts to support the ineffective assistance of counsel claim.

Represented by attorneys Steven M. Presson and Robert W. Jackson, Petitioner sought post-conviction relief from the OCCA in Case No. PC-97-884. All requested relief was denied in an unpublished opinion filed April 28, 1999. [7]

On October 3, 2000, Petitioner filed a preliminary petition for writ of habeas corpus. Dkt. # 21. On December 4, 2000, Petitioner filed an amended petition, seeking relief for constitutional violations on the following grounds:

(1) Defense counsel's failure to adequately investigate and present a case for mitigation deprived Mr. Young of constitutionally effective assistance of counsel;

(2) The introduction of "victim impact" evidence violated Mr. Young's Eighth and Fourteenth Amendment rights;

(3) The trial court's instruction on the "especially heinous" aggravating circumstance which included vague definitions of the terms "cruel" "heinous" and "atrocious" failed to provide definite guidance which would limit the discretion of the sentencer, and therefore this aggravating circumstance must be set aside;

(4) The great risk of death aggravator, as it is applied to Mr. Young, is unconstitutional;

(5) Mr. Young's statements concerning shoes police seized from his home were unconstitutionally obtained and should have been suppressed; and

(6) Cumulative error entitled Mr. Young to habeas corpus relief.

Dkt. # 22. Petitioner also claims he is entitled to a federal court evidentiary hearing to demonstrate trial counsel's ineffectiveness. Respondent filed his response on March 5, 2001. Dkt. # 30. Petitioner filed a reply to Respondent's response on April 4, 2001. Dkt. # 33. On July 24, 2003, and April 15, 2004, Petitioner filed notices of supplemental authority regarding the ineffective assistance of counsel claim. Dkt. ## 50, 54. On May 18, 2007, Respondent filed a notice of supplemental authority regarding Petitioner's ineffective assistance of counsel claim. Dkt. # 57.

By Order filed October 24, 2002, this Court granted Petitioner's request to hold his petition in abeyance pending exhaustion of an additional claim in state court based upon Ring v. Arizona, 536 U.S. 584 (2002). See Dkt. # 42. Petitioner exhausted his Ring claim in state court and the stay in this habeas proceeding was lifted. Dkt. # 51. With this Court's permission, Petitioner filed an amendment to his petition, adding a claim based upon Ring. Dkt. # 52. By Order filed September 23, 2005, the Court granted Respondent's motion to dismiss the Ring claim as time barred. Dkt. ## 53, 55.

## GENERAL CONSIDERATIONS

### I.   Exhaustion

As a preliminary matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b) and (c). See Rose v. Lundy, 455 U.S. 509, 510 (1982).  Federal habeas corpus relief is generally not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. §2254(b). Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994). See also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the court must first consider exhaustion. Harris, 15 F.3d at 1554. "...[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). The Supreme Court has long held that a federal habeas petitioner's claims should be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims. Id. at 731 (citing Ex parte Royall, 117 U.S. 241 (1886); Rose v. Lundy, 455 U.S. 509 (1982); Castille v. Peoples, 489 U.S. 346 (1989); 28 U.S.C. § 2254(b) (codifying the rule)).

The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts. Therefore, "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). State courts must have the rightful opportunity to adjudicate federal rights. The "[p]rinciples of exhaustion are premised upon recognition by Congress and the Court that state judiciaries have the duty and competence to vindicate rights secured by the Constitution in state criminal proceedings." Michael Williams v. Taylor, 529 U.S. 420, 436-37 (2000).

Respondent contends that some of Petitioner's claims are unexhausted. Therefore, this Court will address the exhaustion issue as it arises in each ground.

## II.    Procedural Bar

The Supreme Court has considered the effect of state procedural default on federal habeas review, giving strong deference to the important interests served by state procedural rules. See, e.g., Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an issue on an adequate and independent state procedural ground.  Coleman v. Thompson, 501 U.S. 722, 750 (1991). See also Romero v. Tansy, 46 F.3d 1024, 1028 (10th Cir. 1995); Brecheen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994).

A state court's finding of procedural default is deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998).  If the state court finding is applied "evenhandedly to all similar claims," it will

8

be considered "adequate." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v. Lovorn, 457 U.S. 255, 263 (1982)).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Wainwright v. Sykes, 433 U.S. 72 (1977).

## III.   Standard of Review - AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA" or "the Act") specifically delineates the circumstances under which a federal court may grant habeas relief. Title 28, section 2254 (d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d), this Court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts,

or unreasonably applied the governing legal principle to the facts of Petitioner's case. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A federal habeas court "may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court law. Early v. Packer, 537 U.S. 3, 8 (2002).

Petitioner's habeas proceedings in the instant matter commenced well after the effective date of AEDPA. Although the crime for which Petitioner was convicted predates the law's enactment, the provisions of the Act govern pursuant to Lindh v. Murphy, 521 U.S. 320 (1997). Therefore, to the extent Petitioner's claims are cognizable in a federal habeas corpus proceeding, those claims shall be reviewed pursuant to § 2254(d).

## IV.  Timeliness of Habeas Corpus Proceedings

As an initial matter the Court shall address Respondent's assertion that Petitioner failed to file the petition under consideration in a timely fashion. See Dkt. # 30 at 7-8.  Under 28 U.S.C. § 2244(d),  the limitations period for filing a federal habeas corpus petition begins to run from the date on which a prisoner's conviction becomes final. Petitioner's conviction became final on October 4, 1999, the date when the United States Supreme Court denied certiorari review of his direct appeal. See Locke v. Saffle, 237 F.3d 1269, 1273 (10th Cir. 2001). As a result, his one-year limitations clock began to run on October 4, 1999. By Order entered September 29, 2000, Petitioner was granted leave to file an amended petition by December 4, 2000, provided he filed a preliminary petition by October 3, 2000, and did not add claims in his amended petition. See Dkt. # 18. Petitioner filed his preliminary petition on October 3, 2000 (Dkt. # 21). He filed his amended petition on December 4, 2000 (Dkt. # 22), and it did not contain additional claims. The amended

10

petition supercedes and replaces the original petition, but relates back to the date of the original petition. See Fed. R. Civ. P. 15(c); see also Murray v. Archambo, 132 F.3d 609, 612 (10th Cir. 1998); Woodward v. Williams, 263 F.3d 1135, 1142 (2001) (amendment relates back if the original motion was timely filed and the amendment does not seek to add a new claim or to insert a new theory into the case). Having reviewed its prior ruling (Dkt. # 18) in light of the renewed arguments presented by Respondent in his response to the petition, and finding no basis warranting reconsideration, the Court concludes that Respondent's request to dismiss the petition as time barred (Dkt. # 30 at 7) shall be denied.

## PETITIONER'S CLAIMS FOR RELIEF

### I.   Ineffective assistance of trial counsel

In ground one, Petitioner asserts that his trial counsel was ineffective during the second stage of trial for failing to adequately investigate and present a case for mitigation. More specifically, Petitioner claims his attorney presented no witnesses in the penalty stage, made no reference to mitigation in his second stage closing argument, did not determine what information possible witnesses possessed, did not educate or prepare potential witnesses, did not inform Petitioner or his parents of the role of mitigation evidence, and did not investigate or present psychological evidence or other evidence that would have "humanized" Petitioner in the eyes of the jury. He also argues that Petitioner's consent to present a stipulation in lieu of witnesses was not an informed decision. As part of his ineffective assistance of counsel claim, Petitioner alleges that the OCCA did not properly reweigh mitigation evidence and aggravating circumstances because it did not consider extra-record mitigation evidence.

Respondent contends that a portion of Petitioner's argument is unexhausted. Specifically, Respondent asserts that Petitioner has not previously presented a claim that the OCCA's reweighing of mitigation evidence and aggravating circumstances was invalid because the state appellate court did not consider the omitted extra-record mitigation evidence. The Court finds that Petitioner's argument regarding the OCCA's opinion is not a new or separate issue which needed to be presented to the state court, but is a portion of Petitioner's assertion that the OCCA's decision was not a reasonable application of Supreme Court law or a reasonable determination of the facts as required under AEDPA. This Court finds that Respondent's exhaustion argument is without merit, and that Petitioner has exhausted his ineffective assistance of trial counsel claim.

*Review Standards*

Claims of ineffective assistance of counsel are mixed questions of law and fact. <u>Bland v. Sirmons</u>, 459 F.3d 999, 1030 (10th Cir. 2006); <u>Wallace v. Ward</u>, 191 F.3d 1235, 1247 (10th Cir.1999) (applying AEDPA). It is well established that to prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-pronged standard established by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 488-89 (1986); <u>United States v. Cook</u>, 45 F.3d 388, 394-95 (10th Cir. 1995).  The <u>Strickland</u> test requires a showing of both deficient performance by counsel and prejudice to Petitioner as a result of the deficient performance.  <u>Strickland</u>, 466 U.S. at 687.  Deficient performance is established by showing counsel committed serious errors in light of "prevailing professional norms" to the extent that the legal representation fell below "an objective standard of reasonableness." <u>Strickland</u>, 466

U.S. at 688.[8] To satisfy the deficient performance prong of the test, Petitioner must overcome a strong presumption that counsel's conduct fell within the "wide range of reasonable professional assistance [that] . . . might be considered sound trial strategy." Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994) (citations omitted). Finally, the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled." Id. "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" Le v. Mullin, 311 F.3d 1001, 1025 (10th Cir. 2002) (citing Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997) (quoting Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by* Daniels v. United States, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001)).

Even if the petitioner is able to show constitutionally deficient performance, he must also show prejudice under Strickland's second prong before a reviewing court will rule in favor of an ineffective assistance of counsel claim. "Prejudice" in this context means that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.  Stated differently, Petitioner must prove that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) (citing Strickland, 466 U.S. at 694). When a petitioner is specifically challenging the imposition of the death sentence during the punishment phase of the trial, the prejudice prong of Strickland focuses on whether there is "a reasonable probability that,

---

[8]     The Strickland Court declined to form a checklist for evaluation of attorney performance or to exhaustively define the obligations for counsel, saying:"More specific guidelines are not appropriate. The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. . .The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Bland v. Sirmons, 459 F.3d 999, 1030 (10th Cir. 2006); Strickland, 466 U.S. at 695.

Courts may address the performance and prejudice components in any order and need not address both if a defendant fails to make a sufficient showing of one. See Strickland, 466 U.S. at 697. Failure to establish either prong of the Strickland standard will result in a denial of Petitioner's Sixth Amendment claims.  Id.  The Strickland test qualifies as "clearly established Federal law, as determined by the Supreme Court" under AEDPA, and must be applied in reviewing an ineffective-assistance claim. See Williams v. Taylor, 529 U.S. 362, 363 (2000).

Finally, a claim of ineffective assistance "must be reviewed from the perspective of counsel at the time." Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir. 1998) (quoting Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994)).  Every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland at 689.

*Procedural history of ineffective assistance claim*

Petitioner challenged several instances of alleged ineffective assistance of counsel in his direct appeal proceedings. One of the allegations was that his trial attorney failed to adequately investigate mitigation.[9] See Amended Brief of Appellant filed Jan. 15, 1997, in OCCA Case. No F-95-1142, at 66-8. In support of his claim, Petitioner submitted a motion pursuant to Rule

---

[9]      Contained within this argument was Petitioner's assertion that his decision to present a stipulation of facts in the second stage, rather than mitigation witnesses, was not an informed decision because his attorney did not investigate possible mitigation evidence. See Amended Brief of Appellant filed Jan. 15, 1997, in OCCA Case. No F-95-1142, at 67-8.

14

3.11(B)(3)(b), Rules of the Okla. Ct. of Crim. Apps., for an evidentiary hearing. Attached to this motion were a variety of materials intended to support his claim that the mitigation evidence presented at the punishment phase of his trial was constitutionally inadequate.[10]  The record also reflects that during the pendency of appellate proceedings, Petitioner's direct appeal counsel vigorously attempted to obtain funding for expert witnesses to support Petitioner's ineffective assistance of counsel claim. See original records in Oklahoma appellate Case Nos. MA-1997-342, MA-1996-1401, and PE-1997-51.

The OCCA denied relief on this claim, finding:

> In his fourth allegation of ineffective assistance of counsel, Young argues trial counsel failed to investigate mitigating evidence. This issue is not supported by the record. The record indicates counsel was prepared to call seven witnesses in mitigation.

Young, 992 P.d at 347. The OCCA's decision is an "adjudication on the merits" for purposes of § 2254(d). See Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999).  Although the OCCA did not articulate a reasoned application of federal law to the facts of the case, this Court, nonetheless, owes deference to the result reached by the OCCA. Id.  The OCCA's decision must be upheld unless an independent review of the record and pertinent federal law leads to the conclusion that the OCCA's result "contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." Id. at 1178.  Habeas corpus relief cannot be granted on this issue unless the OCCA's result is legally or factually unreasonable. Id.

---

[10]     The materials included documentation evidencing appellate counsel's attempts to obtain funding for expert witnesses, a transcription of an interview between appellate counsel and chief trial counsel, Jim Fransein, and affidavits of various other persons who had knowledge of Petitioner and were willing to be called as mitigation witnesses, but were not called.

15

In his state application for an evidentiary hearing on the issue of ineffectiveness of trial counsel, filed contemporaneously with his direct appeal petition, Mr. Young argued that his trial attorney did not determine what mitigating evidence was available, nor did he prepare the few mitigation witnesses who were subpoenaed. See Application for Evidentiary Hearing filed Dec. 16, 1996, in OCCA Case No. F-95-1142. Because the OCCA failed to address the application for an evidentiary hearing in its original order denying relief, a rehearing was granted. Upon rehearing, the OCCA explained its denial of the ineffective assistance claim in more detail:

> In support of his application for a hearing, Young offers several affidavits and a transcription of an interview with trial counsel. Some of the affidavits are from family members and friends who stated that they were willing to testify at trial, but were never contacted to testify. Other affidavits are from purported experts in the field of human behavior, capital murder cases and mitigating evidence. The mitigating evidence contained in the affidavits show that witnesses would have testified that Young was a loving father and a nice person; that Young was discharged from the Army because he was determined to be mentally unfit; that Young had lost a brother and son to sickle cell anemia; and that Young still lived with his domineering mother. The interview with trial counsel shows that both Young and his mother indicated that they did not want family and friends called to present mitigating evidence.

> The trial record revealed that trial counsel negotiated a stipulation regarding mitigation. Therefore, Young did not waive mitigation. *See Young,* 1998 OK CR 62, ¶¶ 35-36. This stipulation contained a statement that Young's family and relatives love him; Young has been a minister for eleven years; and that Young is a [sic] honorably discharged veteran of the Army. In our Opinion we concluded that this stipulation strategically avoided the risk of damaging rebuttal evidence and the risk of cross-examination. *Id.* at ¶ 36.

> Upon review of the application and the supporting affidavits and evidence, we find Appellant has shown this Court that trial counsel could well have utilized this evidence and that it may have been prudent for him to do so. However, Young has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize or identify this evidence. Accordingly, we decline to grant Appellant's application for an evidentiary hearing. *See Darks v. State*, 1998 OK CR 15, ¶ 64, 954 P.2d 152, 168.

Dkt. # 22, App. Ex. 1, Order Granting Rehearing and Denying Relief, filed February 19, 1999, in

OCCA Case No. F-95-1142.  The OCCA did not apply the Strickland test, as required. Instead, the

state appellate court required Petitioner to show by "clear and convincing evidence" that he was

prejudiced by counsel's failure to utilize available mitigation evidence.

Finally, Petitioner raised an ineffective assistance of counsel claim in post-conviction

proceedings. In his application for post-conviction relief, Petitioner re-urged his claim that trial

counsel was ineffective for failing to investigate mitigation, and attached affidavits from mental

health expert, Mary Wanda Draper,  and licensed clinical psychologist, Philip J. Murphy. The

OCCA found the issue was procedurally barred because the claims of ineffective assistance of

counsel "do not turn on facts or information unavailable at the time of his direct appeal." Dkt. # 22,

App. Ex. 2 at 3.

Respondent asserts that insofar as the ineffective assistance of counsel claim was reviewed

on the merits by the OCCA, Petitioner has failed to demonstrate that the OCCA's disposition of this

issue was contrary to, or an unreasonable application of, clearly established Supreme Court law.

Respondent also claims that Petitioner has procedurally defaulted the portion of his ground one

claim which was first raised in post-conviction proceedings.

*Procedural bar*

As an initial matter, the Court will address Respondent's argument that Petitioner's

ineffective assistance of counsel claim, insofar as it relates to counsel's failure to obtain expert

mitigation witnesses, is procedurally barred.  In considering Petitioner's claim on post-conviction

appeal, the OCCA imposed a procedural bar on this claim, finding that:

> Also in proposition two, Young argues he was denied effective assistance of
> trial and appellate counsel regarding the issue of the presentation of mitigation

17

evidence. After reviewing the record, we find Young's ineffective assistance of trial counsel claims do not turn on facts or information unavailable at the time of his direct appeal. *Braun v. State*, 1997 OK CR 26, 937 P.2d 505, 511; *See Walker*, 933 P.2d at 332 (quoting 22 O.S.Supp. 1995, § 1089(D)(4)(b)(1)). Consequently, Young has not met the prerequisites for review of this claim on the merits. This claim is barred. *Walker*, 933 P.2d at 332.

Dkt. # 22, App. Ex. 1,Opinion Denying Post-Conviction Relief, filed April 28, 1999, in OCCA Case No. PC-97-884. In response to the petition, Respondent urges this Court to uphold the procedural bar and deny Petitioner's ineffective assistance of counsel claim relating to the expert mitigation witnesses on that basis.  However, the Court finds that consideration of the claim is not precluded in this case for the reasons stated below.

As noted earlier, the doctrine of procedural bar prohibits a federal court from considering a specific habeas claim where the state's highest court declined to reach the merits of that claim on independent and adequate state procedural grounds, unless a petitioner "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724 (1991); see also Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995); Gilbert v. Scott, 941 F.2d 1065, 1067-68 (10th Cir. 1991).  "A state court finding of procedural default is independent if it is separate and distinct from federal law." Maes, 46 F.3d at 985.  A finding of procedural default is an adequate state ground if it has been applied evenhandedly "'in the vast majority of cases.'" Id. (quoting Andrews v. Deland, 943 F.2d 1162, 1190 (10th Cir.1991)).

Applying the principles of procedural bar to this issue, the Court finds that the OCCA's procedural bar based on Petitioner's failure to raise the claim in a direct appeal is an "independent" state ground because it "was the exclusive basis for the state court's holding." Maes, 46 F.3d at 985.

However, as to the adequacy of the procedural bar imposed on Petitioner's claim of ineffective assistance of trial counsel, the Tenth Circuit Court of Appeals has recognized that countervailing concerns may justify an exception to the general rule of procedural default.  Brecheen v. Reynolds, 41 F.3d 1343, 1363 (citing Kimmelman v. Morrison, 477 U.S. 365 (1986)).  The unique concerns are "dictated by the interplay of two factors: the need for additional fact-finding, along with the need to permit the petitioner to consult with separate counsel on appeal in order to obtain an objective assessment as to trial counsel's performance."  Id. at 1364 (citing Osborn v. Shillinger, 861 F.2d 612, 623 (10th Cir. 1988)). In English v. Cody, 146 F.3d 1257 (10th Cir. 1998), the Tenth Circuit explicitly narrowed the circumstances requiring imposition of a procedural bar on ineffective assistance of counsel claims first raised collaterally.  In English, the Circuit Court concluded that:

> Kimmelman, Osborn, and Brecheen indicate that the Oklahoma bar will apply in those limited cases meeting the following two conditions: trial and appellate counsel differ; and the ineffectiveness claim can be resolved upon the trial record alone.  All other ineffectiveness claims are procedurally barred only if Oklahoma's special appellate remand rule for ineffectiveness claims is adequately and evenhandedly applied.

Id. at 1264 (citation omitted).

After reviewing the record in the instant case in light of the factors identified in English, the Court concludes that the procedural bar imposed by the OCCA on Petitioner's ineffective assistance of trial counsel claim was not adequate to preclude federal habeas review.  As indicated above, Petitioner was represented at trial by attorneys Jim Fransein and Stuart Southerland. On appeal, Petitioner was represented by attorney Paula Alfred, an assistant with the Tulsa County Public Defenders office.  For purposes of the first requirement identified in English, the Court finds that Petitioner had the opportunity to confer with separate counsel at trial and on appeal.  The second English factor requires that the claim could have been resolved either "upon the trial record alone"

19

or after adequately developing a factual record through some other procedural mechanism.  Id. at 1263-64.  The Court finds that resolution of Petitioner's allegations concerning trial counsel's failure to investigate psychological evidence and present expert mitigation witnesses is not apparent from the trial record. Thus, the claim is not subject to a valid procedural bar.  Accordingly, this Court will examine the merits of the ineffective assistance claim presented to the OCCA in post-conviction proceedings in its review of all issues related to the ineffective assistance of counsel claim.

This Court now turns to the application of the Strickland standard to the facts of Petitioner's case.

*Analysis*

1.   *Deficient performance*

The only mitigating evidence presented during the second stage of Petitioner's trial was entered by stipulation.  The following record was made regarding the decision to enter the stipulation:

COURT:      Mr. Fransein, it's my understanding that you're desirous of making a record before we call the jury.

FRANSEIN:   Yes, your Honor. At this time, your Honor, the attorney for the defendant would like to advise into the record that having discussed this matter with my client, with his family, I understand this morning it is their wish and their desire not to present any witnesses in mitigation.

I would state to the Court that there is a stipulation that we have agreed upon that will be entered to the jury, however, I would like the record to reflect that sometime prior to the deadline and requirement of Allen versus Washington or the discovery code that we, the defendant, gave to the District Attorney's office a list of witnesses in mitigation including but not limited to Alene Young, Cornelius Young, T.B. Lockridge, Gertrude Deadmon, Dr. Ezell Lewis, Reverend William Hamilton, Richard McDaniel and the defendant was my anticipation to testify in regard to the mitigation of this case involving -- to the good things that he has done, their belief concerning

20

> that he is not a future danger to the community along with past good deeds and other love and affection and other considerations.
>
> It is my client's desire that he not take the stand. It is my client's desire that these witnesses in mitigation not present evidence on his behalf.
>
> I discussed this with my client and I understand that is his wish and at this time for the record I would ask Julius Young to please advise the Court if what I have stated has been the complete truth and statements that I have made are correct.

YOUNG:       Your Honor, that is true and correct at this time.

COURT:       All right. Let the record reflect the defendant Julius Recardo Young has indicated what Mr. Fransein [stated] is true and correct. Do you have anything else you wish to say?

YOUNG:       No, I do not.
. . .

COURT:       Do you have anything else that you wish to present in mitigation other than what is contained in the stipulation?

YOUNG:       No, I do not.

COURT:       Mr. Fransein, you have anything further?

FRANSEIN:   No, your Honor. Professionally there's nothing I can say at this time.

Tr. Trans. Vol. III at 901-03.

The state presented its second stage case by incorporating the first stage evidence and testimony (id. at 910), and presenting the victim impact statement of Catherine Morgan (id. at 912-17). Petitioner's counsel then offered the following stipulation in defense:

> It has been agreed and stipulated by the State of Oklahoma and the defendant that this evidence is being offered to the jury for mitigating circumstances:
>
> That the defendant is 42 years of age and he has been a life-long resident of Tulsa;
>
> Defendant has family, relatives that love him;

Defendant has been a minister in a church for 11 years;

The defendant is a veteran, having served in the U.S. Army and was honorably discharged. Id. at 919. In his second stage closing arguments, Mr. Fransein did not argue mitigation factors, but asked for the jury to spare his client's life. Id. at 929-32.

In this habeas matter, Petitioner devotes the majority of his ground one argument to the deficiency prong of the Strickland standard. As noted above, to determine whether counsel's performance was deficient, this Court must measure it against an objective standard of reasonable performance based on accepted professional norms. See Rompilla v. Beard, 545 U.S. 374, 380 (2005) (citing Strickland, 466 U.S. at 688).

> "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." Romano v. Gibson, 239 F.3d 1156, 1180 (10th Cir. 2001). To perform adequately in a capital case, trial counsel must undertake "'to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Wiggins v. Smith, 539 U.S. 510, 524, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 19889 Guidelines]); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A)(2003) [hereinafter 2003 Guidelines]. Counsel should consider, *inter alia*, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7 Commentary.

Anderson v. Sirmons, 476 F.3d 1131, 1142 (10th Cir. 2007).  Applying those standards, there is little doubt that Petitioner's trial attorney stopped short of making a reasonable investigation for purposes of uncovering relevant mitigating evidence that could have been useful in (1) fully informing Petitioner of all available mitigating evidence and his opinion of its potential effectiveness; and (2) persuading the jury that Petitioner's moral culpability was not sufficient to warrant the death penalty. See Sonnier v. Quarterman, 476 F.3d 349, 358 (5th Cir. 2007).

22

According to the record provided this Court, the trial attorney failed to contact or talk to Petitioner's family and acquaintances at the length or in the depth required. See Dkt. # 22, App. Exs. 4, 5, 9, 10, 11, 12, 13, and 15.  The attorney also failed to obtain the medical history, educational history or psychological testing of Petitioner. Dkt. # 22, App. Ex. 3 at 4-5, 8. Without specifically referencing the deficiency prong of the Strickland standard, the OCCA noted that it might have been prudent for trial counsel to have investigated further and utilize the evidence that was available, but not used. Dkt. # 22, App. Ex. 1, Order Granting Rehearing and Denying Relief, filed February 19, 1999, in OCCA Case No. F-95-1142. This Court agrees with the OCCA's observation and concludes, without belaboring the analysis, that the attorney's failure to adequately investigate mitigation evidence and present it to the jury constituted deficient performance under the first prong of the Strickland test.

2.    *Prejudice*

Having found Mr. Fransein's performance deficient, the Court now turns to an assessment of prejudice under Strickland. The prejudice prong is satisfied if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Petitioner carries the burden of demonstrating that his trial attorney's deficient investigation for mitigation evidence prejudiced his defense. Upon review of the record and the mitigation evidence now presented by Petitioner's current counsel, this Court concludes that the requisite showing of prejudice has not been made. See Knighton v. Mullin 293 F.3d 1165,1178 (10th Cir. 2002).

In making this determination, the Court has considered "the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the

23

defense did offer and any additional mitigating evidence it could have offered." Id. (citing Neill v. Gibson, 278 F.3d 1044, 1062 (10th Cir. 2001)). First, the jury found that Petitioner had brutally beaten to death a mother and son in their apartment. Overwhelming evidence supported this finding. The jury further found the existence of three aggravating factors as to each of the murders:(1) the defendant knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious or cruel; and (3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Although the OCCA invalidated the continuing threat aggravator as to both murders, and the heinous, atrocious or cruel aggravator as to the murder of Kewan Morgan, the "great risk of death to more than one person" aggravator remained as to both murders. The OCCA also left standing the jury's conclusion that the murder of Joyland Morgan was especially heinous, atrocious or cruel. Further, the defense offered mitigation evidence in the form of a stipulation which included statements designed to "humanize" Petitioner. Finally, the Court has examined the mitigating evidence Petitioner claims should have been presented. Petitioner argues that, had his attorney conducted an adequate investigation for second stage evidence, he would have discovered many helpful witnesses who would have humanized Petitioner in the eyes of the jury. Dkt. # 22 at 33. Petitioner presents affidavits to show the nature and extent of available mitigation evidence. He contends that, if presented during second stage, testimony from the following witnesses would have altered the jury's decision to impose the death penalty.

> Reverend William Hamilton - According to his affidavit, Rev. Hamilton did not know Petitioner personally, but was acquainted with him through church. He was willing to testify that Petitioner "always seemed like a nice man." Dkt. # 22, App. Ex. 4.

<u>T.B. Lockridge</u> - This affiant was acquainted with Petitioner through church and was "willing to testify that there were no problems with the [Petitioner] during his time of ministry with our church." Dkt. # 22, App. Ex. 5.

<u>Cornelius Young II</u> - Petitioner's father, Cornelius Young II, indicated in his affidavit that he would have been "willing to testify and assist in the investigation of my son's life" but provided no details about the substance of his potential testimony. Dkt. # 22, App. Ex. 6.

<u>Alene Young</u> - Petitioner's mother, Alene Young, stated in her affidavit that she "would have testified in my son's behalf and would have assisted in any investigation into his life in order to present evidence so that my son would not be sentenced to death." No details were provided about the nature of the evidence she offered to present to help her son. Dkt. # 22, App. Ex. 7.

<u>Gertrude Deadmon</u> - According to the affidavit of Adam Barnett, who interviewed Ms. Deadmon, she was willing to testify that she knew Mr. Young when he was a Youth Guidance Specialist at Rader, and remembered that he was "a person who spoke very intelligently and very well." She was also willing to testify that he "was an impeccable dresser, was well-mannered, and articulated well." Dkt. # 22, App. Ex. 8.

<u>Dr. Mozelle Lewis</u> - According to his affidavit, Dr. Lewis was a long-time friend of the family and had known Petitioner since he was a child. Dr. Lewis was willing to testify that Petitioner "was very well-mannered, shy, quiet, not overt, but seemed happy." Also, Young "had a very mild personality, was rather withdrawn, but was a very courteous child who was willing to do what was asked of him. . . [and was] a nice gentleman." Dkt. # 22, App. Ex. 9.

<u>Cornelius Young III</u> - Petitioner's older brother, Cornelius Young III, stated in his affidavit that Petitioner "suffered and grieved" when their younger brother died of sickle cell anemia. He also stated that it was a devastating loss to Petitioner when his young son also died from sickle cell anemia. He indicated that Petitioner was a good father to his sons, and took care of his parents by doing lawn work and acting as a handy-man around the house. He recalled fond memories of building a club house with Petitioner when they were children, and their good relationship as brothers. Dkt. # 22, App. Ex. 10.

<u>Derrick Young</u> - Petitioner's son, Derrick Young, indicated in his affidavit that his father was "an active participant" in his life, leading his cub scout troop, coaching his T-ball team, and supporting his interest in sports, without pressure. He stated that his father was very strict, and had high expectations about school work . He admitted that his father was not perfect, and suggested that Petitioner's mother "made a lot of the decisions in my Dad's family." Derrick also would have testified that his father was particularly affected when Derrick's younger brother and uncle died of sickle cell anemia. Finally, he would have testified that he believed the person his father most admired was Derrick's great, great grandfather, the Reverend McDaniels, and that his father may have become a minister "hoping it would straighten out his life." Dkt. # 22, App. Ex. 11.

25

<u>Julius Young, Jr.</u> - Petitioner's son, Julius Young, Jr., stated in his affidavit that he loved his father, who was "an active and vital participant" in his life as he was growing up. Petitioner was his cub scout leader and coached his T-ball team. He knew he could always go to his father to discuss problems, and was motivated to do well by his father. He stated that his father would do nice things for him, but did not hesitate to discipline him. He remembers, with fondness, going fishing with his father and the club house his father helped him build with his brother Derrick. His father was supportive and helpful. He would have testified that at the funeral for his brother Dominique, who died of sickle cell anemia, his father was so grief stricken that he tried to pick up the casket "and run away with it." He believes that , if allowed to testify, he "could have helped the jury to see my Dad through my eyes as a caring father who tried to do his best for me, as someone who had suffered terrible losses in his own life, and as a man who became a minister so that he could help other people through their hurts." Finally, he would have testified that his father had never been violent with him, that his father's life had worth and value. Dkt. # 22, App. Ex. 12.

<u>Lorean Laws</u> - According to the affidavit of Petitioner's aunt, Lorean Laws, she would have testified that she had known Petitioner all his life, that he was a very gentle person with a good upbringing from a supportive family. Further, Petitioner always had a loving relationship with both his parents and is particularly close to his mother. She also stated that Petitioner has suffered significant losses in his life, including the death of his son and his brother, both of whom died of sickle cell anemia. Finally, she would have testified that Petitioner had a strong desire to be successful in life and had "a zest for life" that was best expressed through music. Dkt. # 22, App. Ex. 13.

<u>Richard McDaniel</u> - Petitioner's uncle, Richard McDaniel, stated that he was willing to testify that Petitioner was a very mild young man, was never a violent person, and helped out his mother by doing chores like driving and handiwork around the house, and that he did not believe Petitioner committed the crime in question. Dkt. # 22, App. Ex. 14.

<u>Mary Wanda Draper, Ph.D.</u> - Dr. Draper, a developmental epistemologist, performed a study of Petitioner's family and personal background. She explains in her affidavit that she relied upon interviews with Petitioner, his family and friends, and his attorneys. She also reviewed file data and reports concerning Petitioner's childhood, family background, education, employment, military service and medical history. Dr. Draper opined in her affidavit that Petitioner came from a stable and supportive family setting, and enjoyed a normal childhood with excellent family and community support. His behavior and grades in school were average. He did not complete college, but pursued studies in the ministry. He served as a minister for 11 years prior to his arrest and was "recognized by his family and community as a well-behaved, responsible, and caring individual who made many contributions to the well-being of others." She believes Young is the "product of an overprotective mother" and "suffered emotional trauma as a result of the loss of four close family members during a seven year period in his adulthood." Dr. Draper attributes Young's behavior to "severe stress and trauma psychologically." If he committed the murders, Dr. Draper opines that it could have been a result of severe distortion in his rational thinking. She believes that if she could

have explained the dynamics of Young's background and circumstances to the jury it could have "reduced the moral culpability of the crimes." Dkt. # 22, App. Ex. 17.

Upon careful review of the mitigation evidence that Petitioner's current counsel contends should have been discovered and presented, the Court cannot reasonably conclude that the additional evidence would have made a difference in the sentencing. See Schriro v. Landrigan, --U.S.--,127 S.Ct. 1933, 1943 (2007). Although the mitigation evidence, if discovered and presented, would have shown favorable aspects of Mr. Young's character and provided insight into his upbringing and grief related to deaths in his family, this Court does not find that there is a reasonable probability that its introduction would have caused the jury to decline to impose the death penalty. Nor does the failure of trial counsel to discover and present this evidence undermine this Court's confidence in the jury's determination of the sentence.  The State presented three aggravating circumstances: (1) Mr. Young knowingly created a great risk of death to more than one person; (2) the murder was especially heinous, atrocious or cruel; and (3) the existence of a probability that Mr. Young would commit criminal acts of violence that would constitute a continuing threat to society. The OCCA invalidated the 'continuing threat' aggravating circumstance as to both Counts for insufficient evidence, and the 'especially heinous, atrocious or cruel' aggravating circumstance as to Count II, the murder of Kewan Morgan. The testimony of the witnesses Petitioner claims should have testified during second stage essentially focus on the good character of Mr Young - that he was a responsible, likeable man, with a normal upbringing and adult life except for the unfortunate deaths of several close family members. The fact that the witnesses considered Mr. Young to be a good person would not have supported the notion that the murder of Joyland Morgan was not committed in a heinous, atrocious or cruel manner. See Boltz v. Mullin, 415 F.3d 1215, 1229 (10th Cir. 2005). Nor would the testimony have negated or affected in any way the fact that Mr. Young knowingly created a great

risk of death to more than one person. Finally, the opinions offered by Dr. Draper do not convince

the Court that the jury would have spared Young the death penalty had she been allowed to testify.

Accordingly, the failure of Petitioner's counsel to present the mitigating evidence described did not

constitute prejudice under Strickland. Habeas relief is denied as to this claim.

## II.     Victim impact evidence

At Petitioner's trial, Catherine Morgan, Joyland Morgan's aunt, provided the victim impact

statement on behalf of the victims' family. She testified about the effect of the victims' deaths on

various family members, and recalled pleasant memories about the victims' lives. See O.R. Vol. III

at 913-17. Petitioner's second ground for habeas corpus relief consists of a three part argument

relating to victim impact evidence. First, Petitioner claims that his constitutional rights were violated

because the jury was not instructed about proper use of victim impact evidence. Second, he argues

that his due process liberty interests were infringed upon by the use of victim impact evidence "as

aggravation." Third, he asserts that the victim impact evidence allowed at his trial exceeded

constitutionally permitted bounds.

*Failure to instruct the jury on use of victim impact evidence*

Petitioner's claim that the omission of an instruction on the use of victim impact evidence

violated his rights under the Eighth and Fourteenth Amendments was first raised on direct appeal.

The OCCA rejected Petitioner's argument, finding:

> Young continues his challenge of the victim impact evidence by arguing the
> lack of a limiting instruction on its use requires reversal. Three months after Young's
> trial, this Court handed down Cargle v. State, 1995 OK CR 77, ¶¶ 75-77, 909 P.2d
> 806, 828-29, *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996),
> which set forth a victim-impact limiting instruction to be used prospectively.
> Inasmuch as the Court found the instruction to be a factor in assuring the jury's
> verdict was a "reasoned moral response based on reliable evidence," we examine this

issue further to determine whether the lack of an instruction in this case led to something other than a "reasoned moral response."

      First, we note the jury instructions regarding the definition, proof and use of the aggravating circumstances were thorough and correct. The content of the victim impact statement was properly confined to the guidelines set forth in Title 21 O.S. Supp.1995, § 701.10(C). It was not unduly emotional. The statement simply gave a brief glimpse into the lives of the victims and their relationship with their immediate family. Under these circumstances, where both the use of the evidence in aggravation and the content of the victim impact statement were properly limited, we find beyond a reasonable doubt there is no possibility the victim impact evidence was misused in aggravation by the jury. The lack of instruction as to the use of victim impact evidence is harmless in this case. *See* Toles, 1997 OK CR 45, ¶¶ 36-41, 947 P.2d at 189-92.

Young, 992 P.d at 342 (internal footnote omitted).

      Respondent asserts that the OCCA's decision was not contrary to, or an unreasonable application of, federal law. In support of his claim, Petitioner directs the Court's attention to the OCCA's decision in Cargle v. State, 909 P. 2d 806 (Okla. Crim. App. 1995), in which the state appellate court promulgated a new instruction for Oklahoma trial courts to use in advising juries regarding the proper consideration of victim impact evidence. Cargle was decided after Petitioner's trial. Petitioner argues that, without the benefit of an instruction such as the one later established in Cargle, his jury "most likely" viewed the victim impact evidence as aggravation and jurors were "likely to use victim impact evidence as an aggravating factor unless told explicitly not to do so." Dkt. #22 at 55. These arguments are mere speculation and are not supported by the record. Further, the Court notes that Petitioner never requested an instruction regarding the use of victim impact evidence and did not object to the failure of the trial court to give such an instruction.[11] Finally,

---

[11]    Petitioner's trial attorney did object to the statement of the victim impact witness, prior to her being called to testify, on the grounds that her statement was "more prejudicial than relevant and it denies the defendant an objective determination by the jury as to the appropriate punishment." O.R. Vol. III at 911. The trial court overruled the objection. Id.

although Petitioner points to the instruction promulgated in <u>Cargle</u> which would have satisfied his complaint if used at his trial,  the Court is not convinced that the trial court's failure to expressly give such an instruction entitles Petitioner to habeas relief.

Petitioner's jury was fully instructed as to its duties for determining punishment in the second stage proceedings. In arriving at a determination of punishment the jury was instructed to first determine whether any one or more of the four aggravating circumstances existed beyond a reasonable doubt. (Instruction No. 5, O.R. Vol. III at 483). Jurors were advised they could "consider only those aggravating circumstances set forth in these instructions." (Instruction No. 7, O.R. Vol. III at 485). Only after unanimously finding that one or more of the aggravating circumstances existed beyond a reasonable doubt could the jury even consider imposing a death sentence. <u>Id.</u> The jury is presumed to follow its instructions. <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (citing <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987)). Petitioner's assumption that his jury considered the victim impact evidence to be another aggravating circumstance ignores the plain language of the instructions given at trial, which the jury is presumed to follow.

Petitioner's jury found the existence of three aggravating circumstances beyond a reasonable doubt before recommending the death sentences for Petitioner. Although the OCCA invalidated two of the aggravators for the conviction on Count 2, and one of the aggravators for the Count 1 conviction, the "great risk of death to more than one person" aggravator remains as to both counts. The victim impact evidence presented at Petitioner's trial could not have influenced a finding as to this remaining aggravator. <u>See</u> <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1193 (10th Cir. 2006) (harmless error analysis reasonable when victim impact evidence could not have influenced finding of certain aggravating circumstances).

The OCCA concluded that the omission of a specific instruction regarding victim impact evidence was harmless error and found "beyond a reasonable doubt there is no possibility the victim impact evidence was misused in aggravation by the jury." Young, 992 P. 2d at 342. Although no specific reference was made by the OCCA to Chapman v. California, 386 U.S. 18 (1967), it is clear that the state appellate court applied the Chapman harmless error standard in reaching its conclusion. Dkt. #21 at 6. The Chapman standard requires a state court to determine whether an error is "harmless beyond a reasonable doubt." Id. at 24. This Court finds that the OCCA's application of the Chapman standard to Petitioner's claim was not unreasonable. The absence of a victim impact jury instruction, even if constitutionally necessary, was harmless error. Hamilton, 426 F.3d at 1193.

Additionally, the Supreme Court has determined that aggravating circumstances give effect to constitutional protections by narrowing the class of death eligible murders, and the introduction of victim impact evidence does not eliminate that effect. Tuilaepa v. California, 512 U.S. 967, 979-80 (1994). "[T]he sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." Id. (internal quotations omitted). "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." Id. at 979. This Court finds that the absence of a jury instruction regarding the purpose and use of victim impact evidence did not deprive Petitioner of his Eighth Amendment or Fourteenth Amendment rights. The OCCA's decision on this issue in Young's direct appeal was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Habeas relief shall be denied on this portion of Petitioner's ground two claim.

31

*Violation of due process liberty interests*

Petitioner next asserts the improper use of victim impact evidence in aggravation also violated his "liberty interest in the sentencing process created by Oklahoma law." Dkt. # 22 at 56. Citing Hicks v. Oklahoma, 447 U.S. 343, 347 (1980), Petitioner states that he was deprived of his liberty without due process of law because the victim impact evidence was used in aggravation. Respondent notes that this issue was not raised in state court, is an unexhausted claim, and is subject to procedural bar. The Court agrees.

Petitioner did not allege a violation of his liberty interests in any state court proceedings. Accordingly, the OCCA did not address a liberty issue related to victim impact evidence in its decision on Petitioner's direct appeal or his post-conviction proceedings. Thus, this particular portion of Petitioner's habeas claim appears to be unexhausted. As explained above, a federal claim generally will not be deemed exhausted unless the "substance" of the claim has been "fairly presented" to the state courts. Picard v. Connor, 404 U.S. 270, 277-78 (1971); Johnson v. Cowley, 40 F.3d 341, 344 (10th Cir.1994).

While the Court could require Petitioner to return to state court to raise this claim in a second post-conviction application, the OCCA routinely applies a procedural bar to such claims unless the petitioner provides "sufficient reason" for his failure to raise the claim in an earlier proceeding. Okla. Stat. tit. 22, § 1086; Moore v. State, 889 P.2d 1253 (Okla. Crim. App. 1995).  Because the claim would be subject to a procedural bar in the state courts, the Court finds it would be futile to require Petitioner to return to state court to exhaust this claim. See Duckworth v. Serrano, 454 U.S. 1, 3 (1981) (the futility exception is a narrow one, and is supportable "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile

any effort to obtain relief"); see also Coleman v. Thompson, 501 U.S. 722 (1991); Steele v. Young, 11 F.3d 1518, 1524 (10th Cir. 1993).  As a result, Petitioner's claim is not barred by the exhaustion requirement of 28 U.S.C. § 2254(b).

Nonetheless, Petitioner has procedurally defaulted his specific claim challenging deprivation of his liberty interest by the admission of victim impact evidence at his trial. The doctrine of procedural default prohibits a federal court from considering a specific habeas claim where the state's highest court declined to reach the merits of that claim on independent and adequate state procedural grounds. Coleman, 501 U.S. at 729.  The procedural default of Petitioner's claim never before presented to the OCCA would result in the imposition of a bar based on independent and adequate state procedural grounds should Petitioner return to state court to raise those claims in a second application for post-conviction relief.  See Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995).

As a result, the claim challenging the alleged deprivation of Petitioner's liberty interest which was not raised in state court, will be denied on the basis of the procedural default doctrine unless Petitioner shows "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his procedural default of the claims. Coleman, 501 U.S. at 750; Maes, 46 F.3d at 985. Petitioner has not demonstrated cause and prejudice or a fundamental miscarriage of justice.[12] Accordingly, this portion of his ground two claim shall be denied as procedurally barred.

---

[12]     In his reply to Respondent's response, Petitioner does not address any of Respondent's arguments related to ground two victim impact issues. See Dkt. # 33.

*Improper victim impact evidence*

Petitioner next argues that the victim impact evidence introduced at his trial was unconstitutionally improper under the parameters established in <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). Specifically, he asserts that Catherine Morgan's victim impact testimony improperly referred to conversations, hymns sung by the victim and the victim's future goals. He also argues that testimony regarding the subsequent heart attack of one family member following the murders was "in itself so prejudicial as to be a due process violation under <u>Payne</u>." Dkt. # 22 at 57. The OCCA considered and rejected this claim on direct appeal, finding:

> Title 21 O.S. Supp. 1995, § 701.10(C) provides the State may present evidence "about the victim and about the impact of the murder on the family of the victim." This evidence is subject to the limitations imposed by the Oklahoma Evidence Code as well as the state and federal constitutions. *Toles v. State*, 1997 OK CR 45, ¶ 38, 947 P.2d 180, 189, *cert. denied*, 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 746 (1998). Young argues the statement in his case went beyond these parameters. We have examined the victim impact statement delivered at Young's trial and find it to be squarely within the confines articulated by this Court and the Oklahoma Legislature. The statement explained succinctly the relationships enjoyed by family members with the victims. The statement focused on the effect of the murders on the family of the victims. This is permissible under § 701.10(C).

> Young objects to that part of the statement which included the fact an aunt of the deceased, upon hearing of the murders, suffered a heart attack and died. He argues a causal connection was not proven. This argument is appropriate for trial, not appeal. The presenter of a victim impact statement is subject to cross-examination, and this issue properly could have been plumbed at trial. *Toles*, 1997 OK CR 45, ¶ 39, 947 P.2d at 189.

<u>Young</u>, 992 P.2d at 342. Further, in its mandatory sentence review, the OCCA found:

> When we examine the trial for any infection of passion, prejudice, or other arbitrary factor, we find none. We conclude the sentences of death imposed in this case are factually supported, and not the product of passion, prejudice, or any other arbitrary factor.

Id. at 348. Respondent urges that the OCCA's adjudication of this issue was not contrary to, or an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence.

If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no *per se* bar. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne v. Tennessee, 501 U.S. 808, 827 (1991). In overruling its own previous split decisions in Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), the Supreme Court observed that, "assessment of the harm caused by the defendant has long been an important factor in determining the appropriate punishment, and victim impact evidence is simply another method of informing the sentencing authority about such harm." Payne, 501 U.S. at 808. The Supreme Court further noted that in the majority of cases, "[V]ictim impact evidence serves entirely legitimate purposes." Id. at 825.  In 1992, Oklahoma enacted legislation permitting victim impact evidence. See Okla. Stat. tit. 21, § 701.10 (c) (1992) and Okla. Stat tit. 22, §§ 984, 984.1 (1992). Although not constitutionally barred, victim impact statements remain subject to certain restrictions and limitations. Victim impact evidence cannot be "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Due Process Clause of the Fourteenth Amendment. Short v. Sirmons, 472 F.3d 1177, 1192 (10th Cir. 2006) (quoting Turrentine v. Mullin, 390 F.3d 1181, 1200 (10th Cir. 2004)).

This Court has thoroughly reviewed the victim impact statement presented at Petitioner's trial, and concludes that the evidence did not render Petitioner's trial fundamentally unfair. As noted

35

by the OCCA, Catherine Morgan's statement fell within the allowed parameters of such evidence. Petitioner is not entitled to habeas relief on this issue.

## III.    Heinous, atrocious or cruel aggravator

Petitioner next challenges the constitutionality of the heinous, atrocious or cruel ("HAC") aggravator found in Okla. Stat. tit. 21, § 701.12(4) as failing to legitimately narrow the class of defendants eligible for the death penalty. Petitioner argues that the HAC aggravator, as applied in Oklahoma, enables all murderers to be automatically eligible for capital punishment.  Respondent counters that the heinous, atrocious or cruel definition has been adequately narrowed to comply with constitutional standards, and Petitioner's claim is without merit. Respondent also asserts that, because Petitioner's claim is greatly expanded from the manner in which it was raised it state court, it is unexhausted. The Court finds that the constitutionality of the HAC aggravator was raised in state court and is exhausted. Further, Petitioner acknowledges that the "Tenth Circuit Court of Appeals has held that Oklahoma's heinous, atrocious or cruel aggravating factor is not, on its face unconstitutionally vague," but raises the issue "in a good-faith attempt to change existing law and to preserve his ability to have other courts review this matter." Dkt. # 22 at 58.

On direct appeal Petitioner questioned the constitutionality of the HAC aggravating circumstance applied in his case. The OCCA denied relief, stating:

> In his tenth proposition of error the Appellant argues the aggravating circumstances, "heinous, atrocious, or cruel" and "great risk of death to more than one person" are unconstitutionally vague. This boilerplate argument, which offers nothing new, has been settled in this jurisdiction in favor of constitutionality. *Al-Mosawi v. State,* 1996 OK CR 59 ¶ 67, 929 P.2d 270, 285, *cert denied,* 522 U.S. 852, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997) (great risk of death to more than one person); *Powell v. State,* 1995 OK CR 37, ¶ 70, 906 P.2d 765, 782, *cert denied,* 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996) (heinous, atrocious, or cruel).

36

Young, 992 P.2d at 345.

In Petitioner's case, the jury was instructed:

> As used in these instructions, the term "heinous" means extremely wicked or shocking evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

> The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

O.R. Vol. III at 494. Because the constitutionality of aggravating factors is a question of law, Petitioner must demonstrate that the OCCA's decision was contrary to, or involved an unreasonable application of, federal law as established by the United States Supreme Court. See United States v. McCullah, 76 F.3d 1087, 1107 (10th Cir. 1996); 28 U.S.C. § 2254(d)(1). Petitioner has failed to meet this burden. The Tenth Circuit summarized its position on the constitutionality of Oklahoma's heinous, atrocious or cruel aggravator in Workman v. Mullin, 342 F.3d 1100, 1115-16 (10th Cir. 2003), stating:

> We have repeatedly held that Oklahoma's current definition of "especially heinous, atrocious or cruel" aggravating circumstance is not unconstitutionally vague.

> Workman acknowledges that the Tenth Circuit has routinely upheld the constitutionality of this aggravating circumstance, see, e.g., Romano v. Gibson, 239 F.3d 1156, 1176 (10th Cir. 2001); Thomas v. Gibson, 218 F.3d 1213, 1226 (10th Cir. 2000); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Moore v. Gibson, 195 F.3d 1152, 1175-76 (10th Cir. 1999); Smallwood v. Gibson, 191 F.3d 1257, 1274 (10th Cir. 1999); Hooks v. Ward, 184 F.3d 1206, 1239-40 (10th Cir. 1999); Foster v. Ward, 182 F.3d 1177, 1194 (10th Cir. 1999); Duvall v. Reynolds, 139 F.3d 768, 793 (10th Cir. 1998). Nevertheless, Workman attempts to find room for his argument that the aggravating circumstance is unconstitutionally vague in snippets of language from our cases such as a line from Thomas expressing doubt about blanket application of Oklahoma's early formulation and

37

Judge Lucero's concurrence in <u>Medlock</u>. <u>See generally</u> <u>Thomas</u>, 218 F.3d at 1229 n. 17 ("There exists, at a minimum, a serious constitutional question as to whether an aggravator which makes eligible for the death penalty all murderers who strike more than one blow adequately narrows the class of murderers eligible for the death penalty."); <u>Medlock</u>, 200 F.3d at 1324 ("There must be conscious suffering of more than the brief duration necessarily accompanying virtually all murders. Were this not so, the narrowing construction [that Oklahoma has given the aggravating circumstance] would not have the discretion-limiting effect required by [the Eighth Amendment].") (Lucero, J., concurring).

Oklahoma, however, has limited application of the aggravating circumstance to only those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse. <u>Stouffer v. State</u>, 742 P.2d 562, 563 (Okla. Crim. App. 1987). This limitation was included in the jury instructions in Workman's case. ROA Criminal Appeal, Original Record at 98, Instruction No. 3 A penalty phase ("The phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse."). We have specifically found Oklahoma's new formulation to be constitutional since this limiting language was enacted. <u>Hatch v. State</u>, 58 F.3d 1447, 1468-69 (10th Cir. 1995); <u>see</u> <u>also</u> <u>Duvall</u>, 139 F.3d at 793.

<u>Workman</u>, 342 F.3d at 1115-16. Tenth Circuit precedent forecloses Petitioner's argument that Oklahoma's heinous, atrocious or cruel aggravator is unconstitutionally vague. Habeas relief is denied on this issue.

## IV.    Great risk of death aggravator

In his fourth ground Petitioner asserts that the great risk of death aggravator is unconstitutional, as applied to his case, because it violates his constitutional right against double jeopardy. Petitioner argues that, because the state applied this aggravator to both counts, he was put in jeopardy twice for the same act. He contends that "a person can create a great risk of death to more than one person only one time under the facts present here." Dkt. # 22 at 71. Respondent states that this claim is unexhausted as it was never presented to the state court for adjudication. Petitioner

replies that his direct appeal challenge to the great risk of death aggravator, although briefly worded, was sufficient to place the issue before the state appellate court. On direct appeal Petitioner challenged the constitutionality of both the HAC and great risk of death aggravators on the basis that they are vague and overbroad. See Amended Brief of Appellant, filed Jan. 15, 1997, in Case No. F-95-1142, at 91. No mention is made of a double jeopardy violation. Nor does Petitioner's application for post-conviction relief contain any challenge to the use or application of the great risk of death aggravator in Petitioner's trial. This Court agrees that Petitioner's claim, based on double jeopardy violations, is unexhausted.

As noted above in the analysis of Petitioner's victim impact claim, a federal claim is unexhausted if the substance of the claim has not been fairly presented to the state courts. Picard, 404 U.S. at 275-76. Recognizing that the OCCA would deem this issue procedurally barred if Petitioner were to return to state court to exhaust the claim, this Court finds that it would be futile to require Petitioner to return to state court to exhaust. Although the double jeopardy claim is exhausted for federal habeas corpus review, Petitioner has procedurally defaulted this double jeopardy claim unless he can show "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his procedural default. Coleman, 501 U.S. at 729. Absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice," Petitioner's claim must be denied. Petitioner has not alleged cause and prejudice or a fundamental miscarriage of justice. Accordingly, the double jeopardy claim relating to the application of the great risk of death aggravator in Petitioner's case shall be denied as procedurally barred.

In the alternative, and to the extent Petitioner may be challenging the constitutionality of the great risk of death aggravator simply because it is based on the fact that he killed more than one person, habeas relief is also not available.

> Oklahoma law furnishes the substantive elements of the "great risk of death to more than one person" aggravator, *see* Valdez, 373 F.3d at 1097,[13] and makes clear that "killing more than one person is sufficient to support this aggravating circumstance." Hooker v. State, 887 P.2d 1351, 1364 (Okla. Crim. App. 1994). This principle is well settled under Oklahoma law.

Turrentine v. Mullin, 390 F.3d 1181, 1198 (10th Cir. 2004). The Circuit Court continued its discussion of the great risk of death aggravator in a challenge to its application based solely on multiple murders:

> We have rejected this argument before. In Cartwright v. Maynard, 802 F.2d 1203, 1221-22 (10th Cir. 1986), we held that there was "no constitutional infirmity" in Oklahoma's application of the "great risk of death" aggravator, citing a string of Oklahoma cases that upheld the aggravator based on the mere fact that the defendant killed more than one victim. *Id.*; *see also* Breecheen v. Reynolds, 41 F.3d 1343, 1360-61 (10th Cir. 1994); Ross v. Ward, 165 F.3d 793, 800-01 (10th Cir. 1999). In *Brecheen*, we further explained that the aggravator sufficiently narrows the discretion of the sentencer because it "cannot reasonably be said to apply to every defendant convicted of murder"--- on the contrary, it "only applies to a defined and limited subclass of murderers, namely, those where the defendant's conduct not only resulted in murder, but also posed a significant risk of death to other individuals." Brecheen, 41 F.3d at 1360.

Id. at 1199. This Court is bound by precedent, and must reject Petitioner's challenge to the great risk of death aggravator.

## V.     Admissibility of Young's post-arrest statements

---

[13]     Valdez v. Bravo, 373 F.3d 1093 (10th Cir. 2004).

In his fifth proposition of error, Petitioner claims that his rights guaranteed by the Fifth Amendment were violated by the introduction at trial of statements he made after his arrest regarding blood on a pair of shoes seized by police. Specifically, Petitioner asserts that references to his comments about fish blood, made in the direct examination testimony of Tulsa police officer, Detective Jerry Griggs, should have been excluded. This issue was raised by Petitioner on direct appeal as part of his third proposition challenging the validity of two search warrants, evidence seized by the police pursuant to the search warrants, and statements made by Petitioner at the scene of the alleged illegal search. See Amended Brief of Appellant at 34-41, in OCCA Case No. F-95-1142. In ruling on these issues, the OCCA focused on the validity of the search warrants. Finding no error because the initial warrant was legally sufficient, the OCCA did not address the remaining claims of Petitioner that "fruits of the poisonous tree," including Petitioner's fish blood comments, were also unconstitutionally admitted. Young, 992 P.2d at 339-40. Respondent argues in response to the fifth proposition presented in the amended petition before this Court that the issue fails on the merits. Dkt. # 30 at 43-50.

Detective Jerry Griggs testified that, based upon interviews with various members of the victims' family on the day after the murders, he sought out Mr. Young for questioning. Tr. Trans. Vol. II at 786-89. Other patrol officers stopped Petitioner at 21st and Boulder, and notified Detective Griggs. Id. at 791. Detective Griggs drove to 21st and Boulder for initial questioning of Petitioner regarding the murders, but did not arrest him at that time. Id. at 791-92. Petitioner cooperated with the police and answered questions regarding his activities the night before. Id. at 793-801. When Petitioner declined to sign a waiver allowing a search of his residence and car, he was allowed to leave the scene of the interview. Id. at 801-02. At Petitioner's request, the officers followed him to

41

his mother's place of business at 2100 North Cincinnati. Id. at 802.  Detective Griggs proceeded to have a conversation with Petitioner's mother, Alene Young. Id. at 806. The officers decided to arrest Petitioner at that point. Id. at 807. Petitioner was advised of his rights, and he indicated that he wanted to consult with an attorney. Id. The officers then sought a search warrant for Petitioner's residence. Id. at 808. Pursuant to receipt of the search warrant, the officers proceeded to 1720 East Young Place, where Petitioner lived with his parents. Id. Petitioner accompanied Detective Verna Wilson and Sergeant Wayne Allen to the residence. Also present for the search were Corporal Gary Meek, Detective Tom Campbell, Sergeant Dave Brockman and Detective Griggs. Id. at 809. The purpose of the search was to locate any bloody clothing or shoes, the security chain, and any other evidence in connection with the murders. Id. at 810. Items recovered from Petitioner's residence included a pair of pants, shirt, and a pair of black men's slip-on type dress shoes with tassels on the front portion. Id. at 817. Detective Griggs and Officer Campbell proceeded to look at the items recovered while outside the residence. Petitioner was also present outside the residence. Id. at 818. The officers were preparing to search Petitioner's vehicle. The following direct examination testimony of Detective Griggs describes what happened next:

> Q:     Did you, sir, participate in a search of, if I may, prior to the actual search of the vehicle, was your attention drawn by Detective Campbell in any way?

> A:     Yes, sir, it was.

> Q:     And do you recall what it was that Tom Campbell said to you to draw your attention to him?

> A:     He had brought the black shoes that were recovered from the bedroom closet out into the front yard area and he was shining his flashlight across the shoes in a sidelighting method.

> Q:     And let me ask you, sidelighting, is that a technique used by scene investigators?

A:      Yes, sir, it is.

Q:      What is the purpose for doing that?

A:      It makes small objects become more readily visible.

Q:      You saw him doing that?

A:      Yes.

Q:      And did he call your attention to him?

A:      Yes, sir, he did.

Q:      What words did he speak?

A:      I don't recall the specific words, but it was generally, Jerry, take a look at this.

Q:      And did you go over to where he was standing?

A:      Yes, sir, I did.

Q:      At that time did you hear the defendant Julius Young make any statements?

A:      Yes, sir, I did.

Q:      Had any questions been propounded to him or asked of him?

A:      No, sir.

Q:      Do you recall, sir, specifically what the statement was -- first of all, did Julius Young approach Detective Tom Campbell, if you recall?

A:      Yes, sir, he did.

Q:      And were you standing there?

A:      Yes, sir.

Q:      Based on where you were and what you were able to observe, was his view of what was going on obstructed in any way?

A:      No, sir, he was just standing there watching.

Q:     And did he -- he made a statement. Do you specifically recall what that statement was?

A:     Yes, sir, I do,

Q:     What was the statement?

A:     Said he wore those shoes fishing a couple of days earlier and he wore them when he cleaned some fish.

Q:     Did he state -- make any statement regarding what it was on those shoes?

A:     Said it was fish blood.

Q:     Had anyone in the presence of Julius Young used the word blood in relationship to those shoes?

A:     No, sir, they had not.

Id. at 817-19. Petitioner asserts that these "fish blood" comments made to the officers following his arrest were improperly admitted as evidence at trial in violation of Petitioner's Fifth Amendment rights against self-incrimination during custodial interrogation. Later testimony by Tulsa Police forensic serologist, Ann Reed, confirmed that the blood on Petitioner's shoes was not fish blood, but human blood. Tr. Trans. Vol. II at 899-919.

Although the OCCA did not specifically address Petitioner's claim about the admission of the "fish blood" comments, this Court finds that the issue was fairly presented to the state court for review and the exhaustion requirement is satisfied. Petitioner's allegations in Proposition III of his amended petition on direct appeal were sufficient to fairly present the substance of his claim to the state court. See e.g. Engberg v. Wyoming, 265 F.3d 1109, 1114-16 (10th Cir. 2001) (habeas petitioner had exhausted his claim when he had presented "essential substance" of the issue in state court claim). The state appellate court was presented, but did not analyze or articulate its reasons for denying, Petitioner's Proposition III claim insofar as it concerned the admission of Petitioner's

44

fish blood statement. Therefore, this Court will conduct an independent review of the record and applicable federal law to ascertain whether the state court's denial of relief on this issue was "contrary to, or involved an unreasonable application of, clearly established federal law" under AEDPA. See 28 U.S.C. § 2254(d); Aycox v. Little, 196 F.3d 1174, 1177-78 (10th Cir. 1999) (OCCA's decision still entitled to deference under § 2254(d) even though federal court must conduct an independent review and articulate an appropriate rationale for OCCA's decision).

The Fifth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself. In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Id. at 467. A question frequently presented to the courts in cases in this area is whether particular police conduct constitutes interrogation. In Miranda, it was suggested that interrogation referred only to actual "questioning initiated by law enforcement officers." Id. at 444; Arizona v. Mauro, 481 U.S. 520, 526 (1987). Clarification was provided in Rhode Island v. Innis, 446 U.S. 291 (1980), when the Supreme Court reviewed the "interrogation environment" and found that some police practices were a violation of Miranda even though no express questioning by police was involved. Id. at 299-301.

To support his claim of a Fifth Amendment violation, Petitioner relies upon Miranda and Innis. He argues that the actions of the officers in displaying and examining the shoes in his presence amounts to the type of "harangue in the presence of the suspect" that is forbidden by Innis. Dkt. # 22 at 75, quoting Innis, 446 U.S. at 303. Miranda, however, does not bar the admission of

volunteered statements that are not in response to police questioning. <u>Miranda</u>, 384 U.S. at 478. It is clear from the facts before the Court that Petitioner voluntarily advised the police officers that he had cleaned fish while wearing the shoes they were examining.  Further, the incriminating "fish blood" statement was made by Petitioner without prompting by officers. Petitioner's reliance on <u>Innis</u> is likewise unavailing.

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

<u>Innis</u>, 446 U.S. at 301-02 (footnotes omitted) (emphasis in original). In the <u>Innis</u> case, the Supreme Court focused on the meaning of an "interrogation" under <u>Miranda</u>. The Court concluded that Mr. Innis' incriminating statement, made in response to a conversation between police officers but not directed to him, was not a violation of the rules established by <u>Miranda</u>. Noting that the conversation was "nothing more that a dialogue between two officers to which no response from [Innis] was invited," the <u>Innis</u> Court determined that it could not fairly conclude that Mr. Innis was "subjected to the 'functional equivalent' of questioning." <u>Innis</u>, 446 U.S. at 302. Further, there was nothing to support an argument that the policemen "should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent." <u>Id.</u>

46

The issue before this Court is whether the officers' actions, while "sidelighting" the shoes in Petitioner's presence, rose to the level of the "functional equivalent" of interrogation under Innis. This Court finds nothing in the record to indicate that Officers Griggs and Campbell should have known their observation of, and conversation about, the shoes would elicit Petitioner's voluntary statement about fish blood. The record does not suggest that the actions of the officers constituted the kind of psychological ploy that could be treated as the functional equivalent of interrogation. Accordingly, this Court finds that admission of the statement was not a violation of Petitioner's Fifth Amendment rights. The OCCA's denial of relief on this issue was not an unreasonable application of Supreme Court law, nor was it an unreasonable determination of facts in light of the evidence presented. 28 U.S.C. §2254(d)(1)(2). Habeas relief is denied on this issue.

## VI.   Cumulative error

Petitioner next contends the cumulative impact of errors resulted in a constitutionally unreliable conviction and death sentence. Dkt. # 22 at 76-8. Petitioner exhausted this claim by asserting cumulative error on direct appeal. The OCCA denied relief because the trial errors it recognized were harmless and did not warrant reversal. This Court has reviewed the errors found by the OCCA insofar as they have been presented to this Court, and has found no additional errors. The errors reviewed were harmless or non-prejudicial. Cumulative error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (internal quotations omitted). Having found no additional constitutional errors, this Court will only review the OCCA's decision under the deferential AEDPA standard.  See Short v. Sirmons, 472

F.3d 1177, 1197 (10th Cir. 2006). The Court cannot find under the facts of this case that the cumulative effect of the errors found deprived Petitioner of a fair trial. See Newsted v. Gibson, 158 F.3d 1085 (10th Cir. 1998); Moore v. Reynolds, 153 F.3d 1086 (10th Cir. 1998); United States v. McKneely. 69 F.3d 1067, 1080 (10th Cir. 1995). The OCCA's denial of Petitioner's claim based on cumulative error was not an unreasonable application of Supreme Court law. Petitioner is not entitled to relief on this claim.

**VII.    Evidentiary hearing**

In his request for relief (Dkt. # 22 at 78-80), Petitioner asks for an evidentiary hearing on his ineffective assistance of counsel proposition. As the disposition of Petitioner's habeas corpus petition does not require reference to any materials beyond those that are available and currently before the Court, this Court finds that there is no need for an evidentiary hearing in this case. There are no disputed factual questions remaining that could possibly entitle Petitioner to habeas corpus relief. Petitioner has failed to demonstrate the need for an evidentiary hearing under either 28 U.S.C. § 2254(e)(2) or any other governing principle of law. Williams v. Taylor, 529 U.S. 420 (2000). Accordingly, Petitioner's request for an evidentiary hearing is denied.

**ACCORDINGLY IT IS HEREBY ORDERED** that:

1.      Marty Sirmons is substituted for Mike Mullin as the party Respondent and the **Court Clerk is directed** to note such substitution on the record.

2.      Petitioner's preliminary petition (Dkt. # 21) has been replaced and superceded by the amended petition (Dkt. #22).

3.      Petitioner's request for habeas relief (Dkt. # 22) is **denied**.


**DATED** this  2nd day of August 2007.



James H. Payne
United States District Judge
Northern District of Oklahoma

49